IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BOSTON CULINARY GROUP, INC.,** : | |
| **Plaintiff** : | |
| **v.** : | **CIVIL NO. 1:CV-08-0045** |
| **JDK CATERING, INC.,** : | |
| **Defendant** : | **JUDGE SYLVIA H. RAMBO** |
| **and** : | |
| **PENNSYLVANIA CULINARY** : **GROUP, LLC,** : | |
| **Nominal Defendant** : | |

## M E M O R A N D U M

The instant case arises out of a contract dispute between Boston Culinary Group, Inc. and JDK Catering, Inc. concerning their partnership in Pennsylvania Culinary Group, LLC. Before the court are cross motions for partial summary judgment. (Docs. 25 and 28.) The parties have briefed the issues, and the motions are ripe for disposition.

I.    **Background**

A. **Facts**

The following facts are undisputed except where noted. Boston Culinary Group ("BCG") is a national firm providing food and beverage contractor services throughout the United States. (Doc. 34-3, Joseph Armstrong Dep. at 9.) Joseph H. Armstrong is the president of BCG. JDK Catering, Inc. ("JDK") is a catering and concession services provider located in Harrisburg,

Pennsylvania.  (Doc. 26-2, Jennifer Delaye Dep. at 21-27.)  JDK is owned by
Jennifer Delaye.  (*Id.* at 9-11.)  In July 2004, BCG and JDK contracted to form
Pennsylvania Culinary Group, LLC ("Pennsylvania Culinary") for the sole purpose
of operating food concession and catering services at the Pennsylvania Farm Show
Complex ("Farm Show").  (Compl. ¶ 6; Answer ¶ 6.)  At all relevant times, the only
two owners of Pennsylvania Culinary have been BCG and JDK.  (Compl. ¶ 3;
Answer ¶ 3.)  On July 26, 2004, Pennsylvania Culinary contracted with the
Commonwealth of Pennsylvania to provide food and beverage service at the Farm
Show from July 1, 2004 to June 30, 2007. (Compl. ¶ 10; Answer ¶ 10.)

Until July 1, 2006, BCG and JDK shared the obligation to manage
Pennsylvania Culinary's Farm Show operations.  However, effective July 1, 2006,
Pennsylvania Culinary and JDK entered into a written agreement ("Management
Agreement"), whereby JDK agreed to act as the sole manager of Pennsylvania
Culinary's Farm Show operations through June 30, 2007. (Compl. ¶ 12; Answer ¶
12; Delaye Dep. 185.)  The effect of this agreement was that JDK would assume
both the food service and concession arrangements for the Farm Show, as well as
the catering arrangements.

The Management Agreement contains a provision that the parties refer to
as a performance guarantee:

> JDK agrees to guarantee that [Pennsylvania Culinary] will
> maintain an annual operating cash flow defined as net income
> plus depreciation and amortization ("Operating Cash Flow") at a
> minimum level of ninety (90%) percent of the average of the
> immediately preceding two (2) twelve (12) month periods
> ("Minimum Level"). After each year during the term of this
> Agreement, if the Operating Cash Flow is below the Minimum
> Level, JDK hereby agrees to pay [Pennsylvania Culinary] within
> thirty (30) days from the date of written notification an amount

> equal to the difference between the Minimum Level and the
> Operating Cash Flow as a performance guarantee. . . .

(Doc. 30-2, Ex. 3, Management Agreement.) The Management Agreement was drafted by BCG and its attorneys. (Armstrong Dep. 35.)

In early December 2006, JDK informed BCG that it would no longer continue to manage the Farm Show operations for Pennsylvania Culinary. (Delaye Dep. 194.) JDK managed Pennsylvania Culinary's Farm Show operations from July 1, 2006 to December 24, 2006. (*Id.*) From December 24, 2006 through June 30, 2007 the parties resumed their prior arrangement whereby BCG managed the operations and provided the concession and food service for the Farm Show, and JDK provided catering services to the Farm Show. (*Id.*; Armstrong Dep. 74-48.)

On January 23, 2007, BCG sent JDK a letter seeking to confirm the then-existing state of affairs. (Doc. 30-2, Ex. 4, Jan. 23, 2007 Ltr. from Joseph Armstrong to Jennifer Delaye.) This letter contained the following clause:

> Effective as of December 24, 2006, the agreement set forth in a letter between JDK and BCG [sic] dated July 1, 2006 regarding management (hereinafter "Management Agreement") is terminated and that JDK acknowledges and agrees that effective as of December 24, 2006 BCG will undertake management responsibilities and duties on behalf of [Pennsylvania Culinary] for the performance of the Concession Agreement at the [Farm Show]. The term of the Management Agreement shall continue for so long as the Concession Agreement continues to be in effect including any extension of same.

(*Id.*) The January 23, 2007 letter was signed by Joseph Armstrong on behalf of BCG, but never countersigned by Jennifer Delaye or anyone else from JDK. (*Id.*) Delaye admits that she did not read the letter, and did nothing to act on it. (Delaye Dep. 195-97.) At some point after BCG resumed the concession operations at the Farm Show, it sent JDK a letter seeking to invoke the performance guarantee for the

3

period between July 1, 2006 and December 24, 2006.  (Armstrong Dep. 52, 76-78.)
BCG measured the performance guarantee on a month-to-month basis comparing it
only to the same months—July through December— from the two previous years
and calculated the amount due from JDK to Pennsylvania Culinary to be
$142,106.80.

Under both the Management Agreement and the general operating
agreement that governed the day-to-day operations of Pennsylvania Culinary, JDK
was obligated to pay over to Pennsylvania Culinary all collected receivables
attributed to Pennsylvania Culinary.  (Delaye Dep. 223.)  JDK is withholding the
payment of certain receivables, although the parties disagree about the amount being
withheld and the legal effect of doing so.  (*Id.*)  In her deposition, Delaye testified
that she is withholding $80,000-$85,000 in receivables.  (*Id.*)  However, in its
response to JDK's interrogatory responses, JDK admitted to withholding
$100,598.78.  (Doc. 26-3 at 2.)  BCG believes that the amount being withheld is
higher: $101,451.11.  (Doc. 27-4, ¶ 7.)  The parties agree that JDK is owed a
liquidating distribution from Pennsylvania Culinary of approximately $106,000.
(Doc. 31, Ex. A at 2.)

**B.  Procedural History**

On May 18, 2009, BCG filed its motion for partial summary judgment,
statement of material facts, and supporting brief.  (Docs. 25-27.)  That same day,
JDK filed its motion for summary judgment, statement of material facts, and
supporting brief.  (Docs. 28-30.)  The parties filed their respective briefs in
opposition on June 1, 2009.  (Docs. 32 & 33.)  On June 12, 2009, the parties filed

their respective reply briefs.  (Docs. 36 & 37.)  The motions are now ripe for disposition.

## II.       Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

The court is permitted to resolve cross-motions for summary judgment concurrently. *InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 1998). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. Fed. R. Civ. P. 56; *Raymond Profit Found. v. U.S. Envtl. Prot. Agency*, 930 F. Supp. 1088, 1096 (E.D. Pa. 1996).

## III.    <u>Discussion</u>

The core of the dispute in this case is whether the the performance guarantee contained in the Management Agreement is enforceable, and, if so, against whom. If the performance guarantee is enforceable against JDK, then BCG argues that the net amount owed to it in order to terminate the business operations of Pennsylvania Culinary is $137,118.74. In its motion for partial summary judgment, BCG requests summary judgment only with respect to: (1) that portion of BCG's breach of contract claim that seeks damages for JDK's withholding of receivable from Pennsylvania Culinary; and (2) that portion of JDK's counterclaim that is

premised on a "reverse" performance guarantee running from BCG to Pennsylvania Culinary.[1] JDK seeks summary judgment on the performance guarantee. It argues that no reasonable interpretation of the parties' agreements allows BCG to enforce the performance guarantee against JDK. Because JDK's motion seeks disposition on the broader issue—whether the performance guarantee is enforceable—the court will address it first, and then proceed to address BCG's motion.

## A. JDK's Motion for Partial Summary Judgment

JDK asserts that the Management Agreement is ambiguous and susceptible to multiple interpretations, none of which would allow BCG to enforce the performance guarantee against JDK. First, JDK argues that a fundamental condition underlying the Management Agreement was that the performance guarantee would be calculated on full year's performance by the party responsible for running the concessions, and because JDK only performed for 6 months the guarantee is unenforceable. Second, JDK argues that in its January 23, 2007 letter, BCG affirmatively terminated the Management Agreement upon which is now sues, and cannot enforce the performance guarantee. Finally, JDK argues that the January 23, 2007 letter made BCG subject to the performance guarantee, and therefore, JDK is only responsible for guaranteeing performance for the first 6 months of the agreement – From July 1, 2006 through December 24, 2006. The court will address each of these arguments in turn.

---

[1] After reading the parties submissions, it is clear that neither party appears to be concerned with the contractual niceties that BCG's breach of contract claims are premised upon alleged breaches by JDK of contracts that JDK had with Pennsylvania Culinary rather than BCG. Both parties appear to concede Pennsylvania Culinary is merely a nominal party, and that BCG and JDK are the real parties in interest both in this lawsuit and the contracts that are the subject of dispute of this lawsuit.

### 1. **Performance Guarantee**

JDK's first argument is that the performance guarantee was never triggered against JDK because under the terms of the Management Agreement, the obligation to pay a performance guarantee only came into existence "after each year during the term of the agreement." (Doc. 29 at 10.) JDK argues that this reading "comports with common sense and the business realities of the management of the [Farm Show], given the wide fluctuations between revenues and profit levels at different times fo the year." (*Id.*) JDK's interpretation of the Management Agreement belies its plain language. The first clause of the performance guarantee reads plainly that "JDK agrees to guarantee that [Pennsylvania Culinary] will maintain an annual operating cash flow . . . at a minimum level of ninety (90%) percent of the average of the immediately preceding two (2) twelve (12) month periods. . . ." (Doc. 30-2, Ex. 3, Management Agreement.) This clause, which is the guarantee, does not require performance for a period of one year before the guarantee is applicable. There are no conditions precedent; to the contrary, it plainly states that "JDK agrees to guarantee." (*Id.*) JDK's argument that first clause of the performance guarantee is somehow dependent on second clause is misplaced. The second clause merely states that damages are measured on an annual basis:

> After each year during the term of this Agreement, if the Operating Cash Flow is below the Minium Level, JDK hereby agrees to pay [Pennsylvania Culinary] within thirty (30) days from the date of written notification an amount equal to the difference between the Minimum Level and the Operating Cash Flow as a performance guarantee. . . .

(*Id.*) While the agreement contemplates that damages are measured on an annual basis, there is nothing on the face of the agreement indicating that the guarantee itself is only applicable if the Management Agreement lasts one year.

JDK argues that it would be inequitable to hold it liable for a performance guarantee shorter than the annual period, and that it would constitute an inappropriate reformation of the agreement. The court need not reach the issue of whether reformation is necessary because the court disagrees with JDK's reading of the agreement. A contract is not ambiguous simply because one party disagrees with the interpretation placed on it by the other; rather, it is only ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *See Kripp*, 849 A.2d at 1163. No reasonable construction of the agreement supports the reading suggested by Defendant. If JDK's reading of the Management Agreement prevailed, and any performance by it shorter than one year vitiated its obligation under the performance guarantee regardless of the circumstances, there would be nothing to prevent JDK from performing poorly for 364 days then breaching the agreement and disclaiming any responsibility for its performance. This would not only be an unreasonable reading of the agreement, but would fly in the face of the parties' apparent intent of protecting BCG's interest in Pennsylvania Culinary, and its performance under the contract to manage the Farm Show.

JDK has failed to demonstrate that as a matter of law the performance agreement is unenforceable. The court does not find that the performance guarantee is ambiguous, it plainly states that JDK agrees to guarantee Pennsylvania Culinary's performance. The fact that damages, if any, for JDK's failure to meet the minimum level of performance are measured on an annual basis does not mean that the guarantee is valid only if the agreement exceeds one year. Reading a duration requirement into the Management Agreement would contravene the parties' stated

intent as reflected by the unambiguous language of the agreement. Thus, JDK has failed to adduce any evidence from which a reasonable jury could conclude that the performance agreement is inapplicable unless its performance under the Management Agreement exceeds one year. The court will now address how, if at all, the January 23, 2007 letter impacts the performance guarantee.

## 2. **Effect of the January 23, 2007 letter**

JDK next argues that BCG's January 23, 2007 letter to JDK should be interpreted as the termination of the Management Agreement, and the creation of a new management agreement, thus affecting a novation of the original agreement. For its part, BCG argues that the January 23, 2007 letter was a mere offer about the parties' prospective positions, not a novation of the original Management Agreement, and that the Management Agreement remains validly enforceable for the period that JDK managed the operations of the Farm Show—July 1, 2006 through December 24, 2006.

Because subject matter jurisdiction is based on diversity of citizenship, the court looks to the substantive law of Pennsylvania to determine the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). In Pennsylvania, the fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 480 (Pa. 2006). In cases of a written contract, the intent of the parties is determined by the writing itself. *Id.* Under ordinary principles of contract interpretation, the agreement is to be construed against its drafter. *See Shovel Transfer & Storage, Inc. v. PLCB*, 559 Pa. 56, 739 A.2d 133, 139 (1999). When the terms of a contract are clear and unambiguous, the intent of the parties is to be

ascertained from the document itself; however, when an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. *Ins. Adjustment Bureau, Inc.*, 905 A.2d at 480. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. *Kripp v. Kripp*, 849 A.2d 1159, 1163 (2004). While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact. *Id.*

The court finds that the Management Agreement, standing alone, is unambiguous. The performance guarantee in that agreement plainly states:

> JDK agrees to guarantee that [Pennsylvania Culinary] will maintain an annual operating cash flow defined as net income plus depreciation and amortization ("Operating Cash Flow") at a minimum level of ninety (90%) percent of the average of the immediately preceding two (2) twelve (12) month periods ("Minimum Level"). After each year during the term of this Agreement, if the Operating Cash Flow is below the Minimum Level, JDK hereby agrees to pay [Pennsylvania Culinary] within thirty (30) days from the date of written notification an amount equal to the difference between the Minimum Level and the Operating Cash Flow as a performance guarantee ("Performance Guarantee")

(Doc. 30-2, Ex. 3, Management Agreement.) The plain language of this agreement is an obligation running from JDK to Pennsylvania Culinary for the benefit of BCG. The agreement commenced on July 1, 2006. The undisputed facts demonstrate that in December 2006, JDK informed BCG that it would no longer perform under the terms of the Management Agreement, and that it wished to revert back to the pre-July 1, 2006 arrangement whereby BCG would provide concession and food service at the Farm Show and JDK would provide catering. On December 24, 2006, the

11

parties resumed their previous roles. BCG then drafted a letter dated January 23, 2007 with the expectation of clarifying the parties roles going forward. That letter stated, among other things:

> Effective as of December 24, 2006, the agreement set forth in a letter between JDK and BCG [sic] dated July 1, 2006 regarding management (hereinafter "Management Agreement") is terminated and that JDK acknowledges and agrees that effective as of December 24, 2006 BCG will undertake management responsibilities and duties on behalf of [Pennsylvania Culinary] for the performance of the Concession Agreement at the [Farm Show]. The term of the Management Agreement shall continue for so long as the Concession Agreement continues to be in effect including any extension of same.

(Doc. 30-2, Ex. 4, Jan. 23, 2007 Ltr. from Joseph Armstrong to Jennifer Delaye.)

JDK contends that since this letter terminated the Management Agreement BCG's attempt to enforce the performance guarantee fails. Putting aside questions of whether the January 23, 2007 letter was an offer or a new management agreement between the parties, JDK misreads the plain language of the January 23, 2007 letter. That letter unambiguously states that the July 1, 2006 Management Agreement is terminated "[e]ffective as of December 24, 2006," and effective that date, "BCG will undertake management responsibilities" for the Farm Show. (*Id.*) While it would not be unreasonable to conclude that the January 23, 2007 letter set new expectations and roles for the parties prospectively, no reading of the letter supports the notion that because the Management Agreement was "terminated" on December 24, 2006, BCG cannot seek to enforce the performance guarantee for the time that the Management Agreement was applicable—July 1, 2006 through December 24, 2006. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. *See Ins. Adjustment Bureau, Inc.,* 905 A.2d at 480. Here the January 23, 2007 letter is facially unambiguous

about the effective date of the termination of the Management Agreement—December 24, 2006. The Management Agreement governs the parties's responsibilities from the period of July 1, 2006 through December 24, 2006.[2]

### 3. **Reverse Performance Guarantee**

JDK argues that if it is obligated under the performance guarantee for the period from July 1, 2006 through December 24, 2006, it would still not owe BCG any money because "any losses from the period of JDK's management are more than offset by losses sustained during BCG's period of management." (Doc. 29 at 14.) In effect, JDK argues that if the court finds that the performance guarantee is applicable to JDK that it is only applicable to it for the period between July 1, 2006 and December 24, 2006, and that it is mutually applicable; that is to say, BCG guaranteed its performance to Pennsylvania Culinary during the period between December 24, 2006 and June 30, 2007. BCG does not contest the first part of this statement; it has consistently asserted that it seeks to enforce the performance guarantee only for the "six month period that JDK operated the Farm Show." (Doc. 33 at 11 n.2 (citing Armstrong Dep. 75-77).) However, BCG vigorously denies that there is a reverse or reciprocal performance guarantee running from BCG to Pennsylvania Culinary.

JDK's argument is again premised upon language contained in the

---

[2]The court also notes that, consistent with its discussion in Part.III.A.3., below, JDK would be hard pressed to argue that it relied on any of the promises or ambiguities contained in the January 23, 2007 letter because no one from JDK even read the letter until well after litigation in this matter commenced. (*See* Delaye Dep. 195-197.)

January 23, 2007 letter from BCG to JDK terminating the Management Agreement.

That letter states, in relevant part,

> Effective as of December 24, 2006, the agreement set forth in a letter between JDK and BCG [sic] dated July 1, 2006 regarding management (hereinafter "Management Agreement") is terminated and that JDK acknowledges and agrees that effective as of December 24, 2006 BCG will undertake management responsibilities and duties on behalf of [Pennsylvania Culinary] for the performance of the Concession Agreement at the [Farm Show]. *The term of the Management Agreement shall continue for so long as the Concession Agreement continues to be in effect including any extension of same.*

(Doc. 30-2, Ex. 4, Jan. 23, 2007 Ltr. from Joseph Armstrong to Jennifer Delaye (emphasis added).) JDK emphasizes that despite purportedly terminating the Management Agreement in the first sentence of the paragraph quoted above, it used the same term—Management Agreement, a term that it defined in the July 1, 2006 letter to JDK—to characterize its own role under the January 23, 2007 letter, and that in so doing it incorporated the terms of the July 1, 2006 Management Agreement as the same terms governing its performance from December 24, 2006 forward. Consequently, according to JDK, it would not be unreasonable to conclude that BCG is bound by the performance guarantee in the Management Agreement for the period that it was in charge. For its part, BCG argues that (1) nothing in the July 1, 2006 letter or the January 23, 2007 letter supports JDK's interpretation; (2) JDK never tried to secure a performance guarantee from BCG, and: (3) the January 23, 2007 letter was a mere offer that was never accepted by JDK, and cannot bind BCG to anything.

The court agrees that the January 23, 2007 letter is ambiguous. In one sentence, BCG purports to terminate the Management Agreement, and then a few sentences later appears to revive the agreement in some form when it states that the

"term of the Management Agreement shall continue for so long as the Concession Agreement continues to be in effect including any extension of same." (*Id.*) It is unclear from the letter itself what it is that BCG is referring to when it makes this statement, and therefore the court cannot resolve the question of the parties' intent by looking at the contract alone. Only where the terms of a contract are clear and unambiguous, can the intent of the parties be ascertained from the document itself. *Ins. Adjustment Bureau, Inc.,* 905 A.2d at 480. When an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity; however, ambiguous writings are to be interpreted by the finder of fact, not the court. *See id*; *see also, Kripp*, 849 A.2d at 1163.

Here, BCG argues that parole evidence suggests that JDK never relied on a reverse performance guarantee because Delaye, in her deposition, admitted that neither she nor anyone else at JDK ever attempted to secure a performance guarantee from BCG. (*See* Delaye Dep. 199-200.) BCG also points out that Delaye admitted that she never read the letter prior to her deposition, and, thus, "it is unfathomable how the January 23, 2007 letter could have given rise to a "reverse" [p]erformance [g]uarantee when JDK's president admits that she neither read the letter nor agreed to its terms." (Doc. 33 at 16.) For its part, JDK concedes that it never attempted to negotiate a contract whereby BCG would extend a performance guarantee to JDK, instead, it argues that imposing a performance guarantee upon BCG is one of several potential readings of the dispositive letters, and that the conduct of the parties demonstrates that they resumed the roles that they had prior to the July 1, 2006 Management Agreement—with BCG providing concessions and food service and JDK providing catering—and that the conduct of the parties should

be considered in interpreting any agreement from December 24, 2006 through June 30, 2007.

Although ambiguous writings are to be interpreted by the finder of fact, not the court, the issue before the court is not the ambiguity of the January 23, 2007 letter *per se*. Even assuming that the agreement is ambiguous, the relevant question is whether the undisputed facts demonstrate that JDK is entitled to judgment as a matter of law. Based on the record before it, the court finds that no reasonable jury could conclude that there is a "reverse" performance guarantee running from BCG to Pennsylvania Culinary. While the behavior of the parties after December 24, 2006 clearly demonstrates that they both realized that they would resume their traditional roles where BCG would manage the concessions and food service while JDK handled only catering, there is no evidence in the record that in any way intimates that JDK expected, let alone negotiated, a performance guarantee from BCG. To the contrary, no one at JDK read the January 23, 2007 letter that it now contends is ambiguous. In her deposition, Jennifer Delaye testified as follows concerning the January 23, 2007 letter:

> Q: Do you recall receiving [the January 23, 2007] letter from Mr. Armstrong?
> A: Briefly. Did I act on that letter? No. I did nothing with the letter at that point. . . .
>
> . . .
>
> A: . . . I did not read this letter. I did not sign it. It came. I don't care what it says.

(Delaye Dep. 195-197.) It strains credulity for JDK to argue that it relied on an ambiguous document to its detriment when that document was never read. Thus, while the court finds that the January 23, 2007 letter is susceptible to multiple interpretations, and, thus, ambiguous, the undisputed facts demonstrate that JDK did

not read the document or rely on any ambiguity contained in the letter. JDK cannot now claim the benefit of an ambiguity that it only became aware of *after* the filing of this lawsuit and well after the parties business relationship terminated. After December 24, 2006, the undisputed facts demonstrate that JDK and BCG assumed their pre-July 1, 2006 roles where neither party guaranteed the performance of the other. Based on this record, the court will deny JDK's motion for summary judgment. JDK has adduced insufficient evidence to support its claim that there exists a reverse performance guarantee running from BCG to Pennsylvania Culinary that would in some way obviate its liability under the performance guarantee for the period between July 1, 2006 and December 24, 2006.

## 4. Conclusion

JDK has failed to demonstrate that it is entitled to judgment as a matter of law concerning the enforceability of the performance agreement between the parties. There is insufficient evidence from which a reasonable jury could conclude that the Management Agreement is unenforceable because the JDK did not perform for more than one year. There is also insufficient evidence from which a reasonable jury could conclude that the January 23, 2007 letter was a novation of the Management Agreement, and therefore, the performance guarantee is unenforceable. Finally, there is no evidence from which a reasonable jury could conclude that JDK relied on any ambiguity present in the January 23, 2007 letter or that there exists a performance guarantee running from BCG to Pennsylvania Culinary. For these reasons, the court will deny Defendant's motion for summary judgment.

**B. BCG's Motion for Partial Summary Judgment**

In its motion, BCG seeks summary judgment on two discrete issues: (1) that portion of its breach of contract claim premised upon JDK's withholding of receivables from Pennsylvania Culinary; and (2) the portion of JDK's counterclaim that is premised on the existence of a "reverse" performance guarantee running from BCG to Pennsylvania Culinary. For the reasons that follow, BCG's motion will be granted.

## 1. Withholding of Receivables

The parties do not dispute the elements of a cause of action for breach of contract. To state a cause of action, BCG must demonstrate that (1) a valid contract exists, (2) JDK breached a duty imposed by the contract, and (3) that damages resulted. *See Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 884 (Pa. Super. Ct. 2000). The only dispute between the parties appears to concern the third prong—whether BCG suffered any damages as a result of JDK's breach. JDK admits that it was under an obligation pursuant to the operating agreement between the parties and the Management Agreement to remit to Pennsylvania Culinary all collected receivables attributable to Pennsylvania Culinary. (Compl. ¶¶ 11-12; Answer ¶¶ 11-12.) This satisfies the first prong—the existence of a contract. BCG also admits that it is withholding the sum of $100,598.78 that is due to Pennsylvania Culinary. (Doc. 26-3 at 2; Doc. 32 at 2.) This satisfies the second prong— JDK breached a duty imposed by the contracts. However, JDK argues that BCG suffered no net damages because JDK is owed a liquidating payout from Pennsylvania Culinary in the amount of $106,442.17 which exceeds the amount that it owes in

18

receivables. Thus, JDK argues that if the court finds that the performance guarantee is not enforceable, the net result is approximately $6,000 that is owed to JDK.

While JDK may be right as a matter of fact that if the court were to find the performance guarantee unenforceable that its withholding of remittances was not "improper," it is incorrect as a matter of law that its withholding is immaterial to BCG's lawsuit. Under Pennsylvania's Uniform Partnership Act, 15 Pa. Cons. Stat. Ann. § 8301 *et seq.*, JDK has the right to possess Pennsylvania Culinary property for partnership purposes, but has no right to possess Pennsylvania Culinary property for its own purposes. *See* 15 Pa. Cons. Stat. Ann. § 8342 ("A partner . . . has an equal right with his partners to possess specific partnership property for partnership purposes, but he has no right to possess the property for any other purpose without the consent of his partners.") Here, JDK's president admitted in her deposition that she withheld the receivables from Pennsylvania Culinary because she "had absolutely no leverage" and that she would remit them when the partnership was terminated and "when [she] could ride off into the sunset and be done." (Delaye Dep. 224.) JDK has cited no authority for the proposition that one partner in a partnership agreement can withhold partnership property to maintain leverage against another, and has failed to produce any evidence suggesting that it had a legal or contractual right to withhold receivables validly due to Pennsylvania Culinary. Since JDK admits that an agreement existed requiring it to remit receivables to Pennsylvania Culinary, and that it has receivables that it did not remit, the court will grant BCG summary judgment on its breach of contract claim on this issue. However, there remains a genuine issue of material fact concerning the amount of receivables owed. BCG avers that JDK owes $101,454.11 in receivables and JDK

admits owing only $100,598.78. Resolving this discrepancy is a matter for the jury, not the court on summary judgment, and, thus, a determination on the amount will have to wait for trial.

### 2. "Reverse" performance guarantee

The court has already addressed at length in Part III.A.3 the issue of whether the January 23, 2007 letter from BCG to JDK created a reverse performance guarantee running from BCG to Pennsylvania Culinary. The January 23, 2007 agreement is ambiguous, however, JDK did not rely on any ambiguity contained in that agreement because it never read it. Instead, the record is abundantly clear that after December 24, 2006 both parties resumed their pre-July 1, 2006 roles where neither party guaranteed the performance of the other. BCG seeks summary judgment on that portion of JDK's counterclaim that is premised on the existence of a reverse performance guarantee.

JDK's counterclaim contains three (3) paragraphs, the first of which merely incorporated the previous paragraphs by reference. The other paragraphs state:

2. Upon information and belief, BCG did not properly account for sales and commissions due to JDK under the party's Agreements, and owes JDK substantial sums as a result.

3. JDK is, as [sic] present, unable to quantify the extent of its losses due to BCG's refusal to share or otherwise make available accounting information held by BCG.

(Doc. 5 at 6.)

As an initial matter, the court finds that no reading of JDK's counterclaim suggests that JDK is seeking the implementation of a "reverse" performance guarantee. In fact, JDK appears to concede as much in its response to BCG's motion for summary judgment. Specifically, JDK stated that its argument concerning any "reverse" performance guarantee is "that imposing a performance guaranty upon BCG for its management interval is one of several potential readings of the two dispositive letter agreements drafted by BCG's president and its counsel." (Doc. 32 at 4.) The court has already dealt with this issue at length; quite simply JDK has failed to adduce any evidence that would contradict BCG's evidence that no reverse performance guarantee existed. Therefore, to the extent that JDK seeks to enforce a performance guarantee running from BCG to Pennsylvania Culinary, in its counterclaim or otherwise, based on the January 23, 2007 letter, the court finds that there is no evidence in the record that would support such an arrangement. Because JDK has failed to adduce evidence on an issue upon which it would have the burden at trial, and because it is undisputed that JDK neither read nor relied on anything contained in the January 23, 2007 letter, the court will grant BCG's motion for summary judgment.

**C.** **BCG is entitled to judgment as a matter of law on the enforceability of the performance guarantee from July 1, 2006 through December 24, 2006**

Based on the undisputed facts before it, the court concludes as a matter of law that the performance guarantee running from JDK to Pennsylvania Culinary is enforceable from the period of July 1, 2006 through December 24, 2006. Plaintiff did not seek summary judgment on this issue; however, the parties have fully briefed Defendant's motion for summary judgment where JDK sought judgment as a matter

21

of law that the performance guarantee was not enforceable.  On that issue, the court concluded in Part III.A., above, that: (1) the performance guarantee unambiguously states that JDK guaranteed Pennsylvania Culinary's performance, and that it did not matter that JDK did not perform under the Management Agreement for an entire year; (2) that the January 23, 2007 letter was not ambiguous concerning the effective date of the termination of the Management Agreement—December 24, 2006; and, (3) that any ambiguity in the January 23, 2007 letter is irrelevant because the undisputed facts demonstrate that no one from JDK ever read the agreement or relied upon any ambiguity.  It necessarily follows from these conclusions that the guarantee is enforceable.  Accordingly, there are no genuine issues of material fact left for a jury to decide concerning the enforceability of the performance guarantee for the period that JDK managed the Farm Show.  The only factual issue remaining for trial is the amount of the guarantee that is owed.

The Third Circuit and others have recognized the authority of a district court to grant summary judgment to a non-moving party.  *See Chambers Development v. Passaic County Utilities Authority*, 62 F.3d 582, 584 n.5 (3d Cir. 1995); *see e.g., Rogan v. Menino*, 175 F.3d 75, 80 (1st Cir. 1999); *BF Goodrich v. Betoski*, 99 F.3d 505, 522 (2d Cir. 1996).  Ordinarily, summary judgment will not be granted to a non-moving party without "first placing the adversarial party on notice that the court is considering a *sua sponte* summary judgment motion."  *Chambers Development*, 62 F.3d at 80.  However, the Third Circuit has recognized that notice is not necessary where (1) there was a fully developed record; (2) there was a lack of prejudice to the party against whom judgment will be entered; and, (3) that the decision is purely a legal issue.  *See Gibson v. Mayor and Council of City of*

*Wilimington*, 355 F.3d 215, 224 (3d. Cir. 2004). In *Gibson*, the Third Circuit stated that lack of prejudice means "'that the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" *Id.* (quoting *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1ˢᵗ Cir. 1999)(internal citations omitted).) Here, JDK certainly had the opportunity to put its "best foot forward" because it moved for summary judgment on the very issue that the court now rules against it—the enforceability of the performance guarantee from July 1, 2006 through December 24, 2006. Furthermore, the record on this issue was fully developed by the parties and presented to the court on JDK's motion, and the issue involved—interpretation of an unambiguous contract—is purely a legal issue.[3]

Quite simply, it appears to the court that all of the evidentiary materials that JDK might submit in response to a motion for summary judgment by BCG on this issue are before the court, and there are no material disputes of fact. This evidence, when viewed in the light most favorable to JDK, demonstrates that BCG is entitled to judgment as a matter of law concerning enforceability of the performance guarantee for the period of July 1, 2006 through December 24, 2006. It would be an exercise in futility and a waste of judicial resources for there to be a trial on this issue. Accordingly, because the court finds that JDK had ample opportunity to present evidence concerning the enforceability of the performance guarantee, and indeed invited the court to consider such evidence, that the record is complete on that issue, and that the interpretation of the Management Agreement is purely a matter of law, the court will *sua sponte* grant summary judgment in favor of BCG.

---

[3]It is of no matter that the court found that the January 23, 2007 letter is ambiguous because the undisputed facts demonstrate that JDK did not read or otherwise rely on any ambiguity in that agreement.

The only remaining issue for trial concerning the performance guarantee is whether or not JDK maintained an annual operating cash flow at a minimum level of 90% of the average of the immediately preceding two, twelve month periods as contemplated by the performance guarantee for the period of July 1, 2006 through December 24, 2006.

## III.  Conclusion

For the foregoing reasons, the court will deny JDK's motion for summary judgment (Doc. 28.)  The Management Agreement is unambiguous, and no reasonable fact finder could conclude that the performance guarantee is unenforceable.   The court will grant BCG's motion for partial summary judgment. (Doc. 25.)  BCG is entitled to judgment as a matter of law on its breach of contract claim concerning JDK's withholding of receivables owed to Pennsylvania Culinary, although a determination of the amount of receivables owed must be determined at trial.  BCG is also entitled to summary judgment on the issue of whether a reverse performance guarantee ran from BCG to Pennsylvania Culinary from December 24, 2006 through June 30, 2006.  The court finds that the record clearly establishes that JDK never read, let alone relied upon, anything contained in the January 23, 2007 letter from BCG, and that absent reliance on an ambiguity contained in that letter there is no plausible argument that a reverse performance guarantee ever existed. Finally, because the JDK has had an opportunity to put all of its evidence before the court concerning the enforceability of the performance guarantee, and because no material dispute of fact exists concerning the enforceability of the performance guarantee for the period of July 1, 2006 through December 24, 2006 the court will

*sua sponte* grant BCG judgment as a matter of law on this issue. The court will issue an order consistent with this memorandum.

s/Sylvia H. Rambo
United States District Judge

Dated: July 20, 2009.

BOSTON CULINARY GROUP, INC., :
:
    **Plaintiff** :
:
    **v.** : CIVIL NO. 1:CV-08-0045
:
JDK CATERING, INC., :
:
    **Defendant** : JUDGE SYLVIA H. RAMBO
:
    **and** :
:
PENNSYLVANIA CULINARY :
GROUP, LLC, :
:
    **Nominal Defendant** :

# O R D E R

Consistent with the attached memorandum, **IT IS HEREBY ORDERED THAT:**

(1)  Defendant's motion for partial summary judgment, (Doc. 28), is **DENIED**;

(2)  Plaintiff's motion for partial summary judgment (Doc. 25), is **GRANTED**.  Plaintiff is entitled to judgment on its breach of contract claim premised upon Defendant's withholding of receivables from Pennsylvania Culinary Group, LLC; however, there is a genuine issue of material fact concerning the amount of receivables improperly withheld that must be resolved at trial.  Plaintiff is also entitled to judgment on that part of Defendant's counterclaim premised upon the existence of a performance guarantee running from Boston Culinary Group, Inc. to Pennsylvania Culinary Group, LLC; the court finds as a matter of law that no such guarantee existed;

(3)  Plaintiff is **GRANTED** summary judgment, *sua sponte*, on the issue of the enforceability of the performance guarantee for the period from July 1, 2006 through December 24, 2006;

(4)  The only issues remaining for trial are (1) the amount of receivables owed from JDK to Pennsylvania Culinary; (2) whether or not for the period of July 1, 2006 through December 24, 2006 JDK maintained an annual operating cash flow at a minimum level of 90% of the average of the immediately preceding two, twelve month periods as contemplated by the performance guarantee, and, if not, what amount is owed under the performance guarantee; (3) and that part of Defendant's counterclaim not premised upon the existence of a reverse performance guarantee running from Plaintiff to Pennsylvania Culinary.

(5)  The clerk of court shall defer entry of judgment until after trial.

s/Sylvia H. Rambo<br>United States District Judge

Dated:  July 20, 2009.